U.S. v. Sibbrel Good morning. When this court reversed and remanded the government's first report of this case, it directed the district court to consider the factors set forth in United States v. Jones. But on remand, the district court reached the Jones factors only after it had already determined Mr. Sobrell was not responsible, based largely on the same erroneous legal standards that had applied the first time, and it faulted the government for trying to incorporate the Jones factors into part of the legal standard and dismiss them only summarily after it had already concluded that Mr. Sobrell was not a responsible person. This case meets those Jones factors. Mr. Sobrell was one of two primary owners and officers of Chapman Mechanical, the company at issue here. He owned at least 42% of the company, and some of the evidence indicated he owned 50%, but it was undisputed that he owned at least as much as David Chapman, the only other major shareholder. He was a director, vice president, and secretary of the company, and he had significant authority over corporate finances. It's clear from the hundreds of thousands of dollars in checks that he wrote, including checks to himself, during the period at issue. Not only could he sign checks, but he had independent check-writing authority. He didn't need any second signature on the checks. He could sign them by himself, and he didn't need anyone else's authorization to write a check whenever he decided to do so. That was the uncontroverted testimony not only of Mr. Sobrell himself, but also of David Chapman and the office manager, Barbara Fay. Between January and August of 1995, he wrote over $500,000 in corporate checks, including checks to himself. In fact, he wrote over $300,000 in corporate checks, including $50,000 in checks to himself, after the time the district court found he knew about the outstanding tax liabilities. And this, under this court's precedent, Buffalo, is willfulness as a matter of law, which is the second prong of the standard for liability here. On the responsibility prong, he also was a 50 percent partner in the partnerships that owned the corporation's offices and equipment, and he could hire and fire employees. He supervised the payroll, and he supervised all the operations in the field, which were the meat and potatoes, as it were, of this plumbing contract for business. His authority didn't end with the field operations, as the district court would suggest. He, in fact, signed the employment tax return and an accompanying check for the second quarter of 1995, the quarter after the quarters that issue here. And at that time, the balance of power between Sobrell, Mr. Sobrell and David Chapman, had not changed from what it was during the quarters at issue. He also made loans of his own money to the company, and he signed bank documents, and he could appropriate the company's men and equipment for his personal use without consulting Mr. Chapman. Counsel, you know, those – what you're arguing is – are a lot of facts that indicate that perhaps he could have had power or he could have done something, but I understand in the way this went down, the district court said, as a matter of real fact, he did not have that authority. It might look like it on paper from time to time, he does sign checks, he signs thousands of dollars of checks for himself, he signs checks whenever – of large amounts to the He does all those things, and it looks like maybe he had the authority, but as a matter of fact, he did not have the authority. He didn't – he could not write checks by himself, because that's what the bylaws said and that's how the thing was structured. He really didn't have that authority. I think that's what the district court decided, the difference between what it might look like and what he actually had. Now it does look awfully bad, I mean, from your standpoint. This guy is a 50% shareholder, we all know that a 50% shareholder can gum up a corporation good and proper if he wants to, he can shut it down, he can do lots of things. We know that. So it looks like there are a lot of facts that would support the fact that he is indeed responsible. Well, Your Honor – The district judge said really, in the real honest world, this guy was not. He didn't have this kind of authority. What do we do with that in view of the findings? Well, I think as a matter of law, a number of courts have held that a major shareholder who has the authority to write checks without anyone else's authorization does have the authority as a matter of law. But on that particular point, the judge let's – the finding really seems unassailable. I mean, he found and he certainly seems to have the evidence on which to find that he did not have the authority to write it without authority from someone else. Now what is your evidence that that isn't true? Well, in fact, he – all the officers of the company – those officers of the company, Mr. Sobrell himself and Mr. Chapman testified that he did have the authority to write checks without anyone else's approval, and he in fact did so. He wrote these checks, hundreds of thousands of dollars of checks in text to other creditors and thousands of dollars in checks to himself. He could have – if he could write checks to himself, he certainly had the authority to have written checks to the IRS. Did he make up these checks? Did he write them all out? There are a variety of checks in the record. Many of the checks are handwritten. Some of them are printed. The payroll checks obviously are preprinted checks. I believe there's an exhibit in the record that shows the checks that he wrote, and I believe they do vary in the way that they were – whether they were preprinted or not. But, you know, clearly if he's writing checks to himself, he could have easily – I mean, if David Chapman's not going to stop him from writing checks to himself, it seems at least clearly erroneous that he could have handwritten checks to the IRS. Just a minute. Didn't he testify – didn't the office administrator testify that he – that those were all authorized by Chapman Jr., even the ones to himself? No, he did not. In fact, his testimony on page – I believe it was on page 51 of the transcript was that he could write checks by himself without the authority of anyone else, that he had independent check-writing authority. He did qualify that by saying that he didn't generally write checks because he didn't keep track of what the bank balance was. But his testimony was that he had the authority, as was Chapman's testimony. And under California law, if – The district court essentially discounted Chapman because he had motives to obviously pass on the debts, and I assume he was willing to do so if there was a conflict in the evidence. The question is, is there a conflict of the evidence on the question of authority to write checks with no authorization? I don't believe there's a conflict on the evidence regarding the authority to write checks. Clearly, both Chapman and Sobrell believe that he had the authority to do so, and Barbara Fates' testimony corroborates that conclusion. And the only thing that indicates that he didn't have authority is the lack of any delegation of authority in the bylaws. But given what, in fact, transpired and how the company was operated, that admission in the bylaws is not determinative, because clearly, Sobrell had the authority, whether it was implied authority or delegated from Chapman, and that is enough to make him a responsible person. As the Roth case held in the Eleventh Circuit, that case pointed out that the authority to make one a responsible person can be not only express authority from something like the corporate bylaws, but it can be implied or delegated authority as well. And there are numerous cases, as this Court noted in the first appeal of this case, Sobrell 1, that hold that where a superior officer even directs an officer who could write checks not to pay the taxes, that person is still responsible if they could have written the checks, even if they might have gotten fired or otherwise reprimanded later. There's the Howard case, the Gephardt case in the Third Circuit, the Thibodeau case in the Eleventh Circuit, I believe. Howard, I believe, is the Fifth Circuit. So there are numerous cases that have addressed that issue, and the fact that, as this Court already held in Sobrell 1, the fact that Chapman might have had greater authority in the corporation or even have been able to do something to Sobrell, firing him or otherwise, sending him down the road, as he said in the record, is not determinative as a matter of law. Now, you said that when he wrote many of these checks, for example, the $36,000 checks to himself and $3,000 to himself again and checks here and there in April and into July, I think you said that he knew that the taxes weren't paid at that time. Yes. The district court found, in its opinion, that he knew at least by March of 1995 there was a levy on the bank account of the corporation for a prior quarter of that time, and the district court found that he knew about the outstanding He knew there was a levy, but I thought that he was told by the people who did take care of the finances that the government had been paid, the levy had been released, the government had been taken care of. That was the case with respect to the levy. There was a levy for an earlier period, and the levy was released. Right. And in Mr. Sobrell's brief, he attempts to cast the district court's finding as simply a finding that he knew about tax troubles for prior quarters. But I believe the district court's opinion at page 16 of its opinion, note 30, does indicate that it's holding, that he knew that the employment taxes at issue here remained outstanding, and that he did have discussions with Mr. Chapman at that time, and that the liability at issue here was disclosed. I see the district court at page 15 says that he knew about cash flow problems and the corporation wasn't meeting its obligations. That's on page 15 of the district court's decision? Rather. On page 16 at note 30, and this is in the amended opinion, which would be, I'm looking at the amended opinion. Yes. On page 16. 1-5? 1-6. 1-6. I'm sorry. I heard 15. Okay. It's at note 30. Now, I thought the evidence was as far as to what he knew was that he knew in April of this earlier tax levy, he knew it had been removed. And then the first thing he actually knew of the continuation of the determination not to pay taxes was in June when he met with the creditor. Mr. Chabral's own testimony was that he did know by June, and even after June, there were over $100,000 worth of checks. So even, I mean, I think that, I think, I certainly read footnote 30 as a finding by the district court that he knew as of March 1995 that the taxes at issue here were outstanding, but he clearly admits in the record and hasn't disputed that he knew by June. And, therefore, he did, you know, he did write another $100,000 or so of checks to other creditors after June that do establish the wilfulness at issue here. And I think, you know, the continuing flow of checks, even, I mean, this Court held in the first Chabral decision that whether he knew about the tax liability at the time the taxes were due, is not determinative. His knowledge is not determinative whether he's a responsible person. And the fact that he's writing checks, even if he didn't know the taxes were outstanding, still establishes that he could have done so. And under both Chabral 1, which is the law of the case, and this Court's prior opinion in the Davis case, which is cited in Chabral 1, the lack of knowledge isn't determinative of responsibility. And I think we do, even, you know, even taking, you know, the worst-case scenario for the government that he didn't know until June when he admitted at trial he did know, we still have the requirements for wilfulness as a matter of law under the Buffalo case, because he paid other creditors. He made a voluntary and conscious decision to pay other creditors instead of the United States when he knew the taxes were outstanding. Roberts. So you're saying that if he knew, if he actually knew the government wasn't paid in June, he knew that, then after that, he's writing thousands of dollars of checks, well, thousands of dollars of checks to people other than the government. That's correct, Your Honor. For example, the union trust funds. Right. That is correct, Your Honor. And I think the Sorensen case makes clear that other creditors does include the payroll and the unions and that sort of thing. It's not, you know, paying net wages or paying expenses to keep the business going does not absolve one of willfulness. It's still enough that you're paying other creditors. So in July when he writes the checks to the government for about $80,000, he's also writing checks to the operating engineers and the Southern California pipe trade. Right. I mean, that's your position, that at least on those checks he must have known what was going on. That's correct, Your Honor. And was writing checks. Now, are those – is there any way for anybody to know, are those checks actually written by him or is he just signing paper? The testimony in the record indicates that with respect to the payroll checks, that Barbara Fate and Diana Johnson, who were the office employees, actually did the administrative task of generating the checks. But he was the corporate officer who was in charge of reviewing the payroll, looking over what checks were going to be paid, and actually signing the checks. And I – he was in charge of the operations that would have involved payment of union dues and that sort of thing. And, in fact, the record indicates that the payment of union dues was important to him because it ensured him his medical coverage. You're saying an awful lot in answer to my question. The checks are all done with a check machine in terms of the printing of the number.  And then they're handwritten – there's handwritten material and then there's his signature. The handwritten material, we don't know whether that's him writing or somebody else writing. Is that true? There is no testimony to that effect. All right. But it is – there is testimony to the fact that he was the officer in charge of supervising those categories of checks. I understand. I'd just like to point out that this case is very similar to other cases that impose responsibility as a matter of law, the Barnett case and the Fifth Circuit, and that's not a law – Ultimately, does this case turn on whether we – in its narrowest form, on whether we find the only erroneous judge left his conclusion that essentially, Judge, that Mr. Brown was not delegated the authority to write any checks himself? I mean, is that really the core of the whole thing? Well, I think that is – that finding is clearly erroneous, but even – I mean, I think that perhaps is where it starts. I mean, there's clear error in that finding, but at the same time, there is a mass of evidence that's not disputed. I mean, the fact that he wrote the checks and all the other authority he had, the signing of the employment tax return, the fact he was an officer of the corporation, that under the Jones standards make him responsible as a matter of law. If the district court were right that he had no authority to write any checks on his own, either as a matter of the structure of the corporation, which he did not, or as a matter of delegated authority from Chapman Jr., which is really what you're saying, then it seems to me you have to lose. How could he be a financially responsible person if he couldn't write a check on his own? Well, I just – I mean, that's got to be clearly erroneous. But I'm asking you, don't you lose if it isn't – don't you lose if it isn't clearly erroneous? Don't you have to lose? Any other indices of responsibility you come up with cannot overcome the fact that he could not have written these checks, and what's just the financial – what do the other indices of responsibility have to do with anything? Well, I mean, there are plenty of other indicia of authority under Jones. I mean, he was an officer and he was a director, and he had check signing authority under the Corp Resolution, which is included in Exhibit 5. He clearly could sign an employment tax return during the periods at issue because he did. And, you know, I just – I think it's very hard to conclude that it was not clear error for – to say he couldn't have written these checks when he's, in fact, writing these checks. Well, no, that's not true. I mean, lots of people have authority to have checks – to write checks as ministerial matter who do not have the authority to determine which checks are to be written. Offices are run that way all the time. Well, I think when a person has the authority to sign as many checks as he did and does so, that combined with all the other indicia of authority that I mentioned at the beginning of my argument establishes responsibility as a matter of law. And I think this is the case that amounts to that. At the very least, the conclusion that he didn't have the authority to write all the checks that he did write I think is clearly erroneous on the record before the Court. I gather that Ms. Fate signed a lot of checks. And, again, there's no dispute that she did not have the authority to write checks on her own. Isn't that right? I do not – there are not checks in the record that Ms. Fate wrote, so it's not clear what volume of checks she wrote or what nature of checks she wrote. But it is not disputed that she didn't have authority to write checks on her own. The letter from Mr. Chapman that clarifies that while Ms. Fate did not have that authority and had to get either Mr. Sobrell's or his approval. But, Judge, the district court just discounted Chapman. He was totally entitled to do that. So we really have to leave Chapman's testimony out of this, don't we? Well, Your Honor, I think actually the district court's initial opinion indicates that it was confused about the allocation of the burden of proof here. Under this Court's opinion in Oliver, Mr. Sobrell has the burden of proof. An inference should, if there is dispute, should be drawn in favor of the government. And I'm not sure that, you know, Mr. Sobrell equally had, you know, reason not to want to play up his authority. And that's only up to two judges in fact by this Court, if I were to believe. He decided that. Well, even if you discount Mr. Chapman's testimony, the letter, which is in the record, was written earlier and in a different context than that at trial. And I would just also point out that even discounting Mr. Chapman's testimony, the fact that there's a board resolution that gives him check-signing authority and the fact that he's actually writing a letter. He himself. I'm sorry. It also gave him a state check-signing authority. So that doesn't do it. To me, the strongest thing you've said, since you've stood up, is that Mr. Sobrell himself essentially said he did have the authority. And I was not aware of that, and I find it intriguing and important. But that seems to me to be the core of the case, really. Well, there is a testimony in the record that he, you know, his own testimony that he had the authority to write checks. And he wrote checks to himself. And I think, you know, on that record, that should be enough to establish responsibility as a matter of law and that this Court could put, and we respectfully request that this Court does, interjudgment for the United States, reverse and interjudgment for the United States on that basis. But in any event, it's at least clear error, and judgment below should be reversed. And I think the Attorney's fees would fall. I only have a few seconds left, so I'll reserve those for a brief rebuttal. Thank you. You've gone over your time already. I'm sorry. I'm sorry. I apologize. I was misreading the clock. It started up again. But we'll give you a little refund. Thank you very much. Good morning, Your Honors. Steve Blank representing Rick Sobrell, the defendant, appellee. First, in response to Judge Berzon's inquiry whether Sobrell had any authority, Sobrell testified he had no authority. He testified, technically, I had the authority to sign them. However, I would never sign a check because I didn't know, unless it was prepared for me, because I didn't know how much was in the bank. So maybe technically I could sign them, but not knowing what our finances in the bank are all the time, I would never just go signing them unless it's for 15 to 20 bucks, maybe up to 50 bucks. Correct, Judge. And what I was getting to is he clearly was answering a question whether he had signatory authority. And there's no dispute in the record that he had signatory authority. He wrote, he signed lots of checks. He did, there is testimony in the record that each check. No, that's not true. The question was, and you had the authority, did you not, sir, to sign those checks without seeking the permission of Mr. Chapman? And it was a response to that question that he said later. Correct. And he did say that he would sign for 15 or 20 or maybe up to 50 bucks. He had the authority to sign the checks without the permission of Mr. Chapman. There's also testimony in the record from Barbara Faith as well as David Chapman himself that all payments to creditors were authorized by him. There was no dispute with respect to that. But the question, isn't the question for a responsible person not necessarily what the person does, but what he has authority to do? That's the problem. Absolutely, Judge Fernandez. And what I was going to get to is the authority that presented in this company. The law says you are required to collect, truthfully account for, and pay over taxes. And if you willfully fail to do so, you are a responsible person. The question is, if you're the individual who can order the payment of taxes, clearly you're the responsible person. There's no dispute there. The question is, in every other type of situation, who is the responsible person? There's individuals in some companies that have the titles and they don't have the authority. There's other companies where they don't have any titles, yet they do have authority. So the law in this circuit, as well as the law in other circuits, is trying to get to who has the status, duty, and authority to pay the taxes. With respect to that, the law in this circuit says you must review the factors of Jones and analyze those factors of Jones to determine whether somebody has the status, duty, and authority to determine which creditors can be paid. I submit that the district court did exactly that. What does the record show about the checks that were written after June, the checks that were signed by Mr. Sabrell after June to himself,  The record showed that those checks were handed to him by bar of estate and signed, almost in a stack. And I can't recall whether they're printed or not, but the testimony was very clear at trial that Rick Sabrell not only did not authorize those checks, but he did not write those checks. He did sign those checks. Let's take June on, then. By June, this guy who's a 50 percent shareholder and a director and such knows, I take it, knows that the government's taxes haven't been paid. He does know that. He also has some kind of authority to sign checks if he wants to. He doesn't exercise it, but he has the authority to do it. He doesn't exercise it because he doesn't know what's in the accounts and such, but he could write checks if he wanted to. So in July, he's writing large checks to people other than the government. How do we deal with that? How should a trier of fact deal with that? Well, Your Honor, with respect to those two issues of, A, whether he's a responsible person and whether he acted willfully. I understand. But I submit, based upon everything that was said, that he wasn't a responsible person. But what did he do with those checks? The checks were as soon as I think we need to go. What happened in June? He finds out about the tax liability. Mitch Price comes in and says, how come I haven't been paid? He comes and confronts Mr. Chapman and Barbara Fate. Barbara Fate says, why don't you go talk to Dave Chapman? Didn't he tell you that we owe $500,000? He does. He goes and confronts David Chapman. What kind of conversation does he have with David Chapman? He has a conversation. What are we going to do? David Chapman assures him, don't worry, we have receivables coming in and we're trying to get a bridge loan. Business as usual. Okay? Then checks are handed to him and he says, they say, sign here. The testimony is overwhelming from everybody that he is a subordinate in this company, not in titles, but he is. As a matter of law, can he be a subordinate when he's a 50 percent shareholder? Now, you know and I know that a 50 percent shareholder is not powerless. Forty-nine percent shareholder might be, but a 50 percent isn't. Well, I think the record reflects actually that he was a 42 percent, but assuming that he's an equal shareholder with the two. Well, I see. There seems to be some confusion. There's some confusion, but the stock ledger itself indicates that there were only three checks that were – three stock certificates that were handed out, one to Mel Chapman, one to Rick Sabrell, and one to David Chapman. And those were the initial stocks. He's in charge of the registry, of course.  He's the secretary. Well, he's in charge of the registry. Well, I understand that, but I'm just saying that's what the record reflects. He's either a 42 percent or a 50 percent. Let's say he's 50. He didn't have the power to change the makeup of the board of directors. He didn't have the power to fire the employees. But, for example, when somebody handed him a check to himself, I presume he could have said, you know, I think instead of paying myself, we should pay the government. That's exactly right. And as soon as he had knowledge, Your Honor, his testimony is abundantly clear on that point. I thought that there were checks to himself after Jim. Incorrect. The last check, I think, was June 15th, 1995, and that was one of the reasons he said as soon as he learned of the liability, he quit receiving any checks or making loans to the company. The testimony is abundantly clear on that point. Now, June 16th, he's – June 16th was the last. $30,000 check from Jim. That was the last check he ever received. In fact, what did he do after that point? As soon as he – as soon as he knew of the liability, he did sign – he did sign some checks, as the Court has noted. He did sign the June 30th payroll return. Again, he had never done this in the past. He doesn't understand payroll taxes. Paul Router, the outside accountant, testified to that. Barbara Faith testified to that. It was handed to him and said, sign here. One could infer that he was kind of set up. I'm not making that inference. I'm just saying that was never within his corporate authority to do so. He signed where indicated, and that was it. What happened when Mr. Chapman ultimately abandoned the company? Rick Sobrell then did exactly as the government would expect him to do or this Court would expect him to do.  Instead of seizing the assets, why don't you let me sell the assets because you'll get a lot more money for them if I do it. He went ahead, took $8,000 out of his own pocket to do abatement work, to get underground storage tanks removed, ultimately sold everything, gave all of the proceeds to the IRS. He did exactly what the government would expect him to do, and that was the time when he was in control. With respect to a couple of things the government's mentioned, they've indicated that he wrote checks. It continues to be mentioned that he wrote checks and supervised payroll. The testimony doesn't reflect that he supervised payroll. He checked the time cards like a plumbing foreman would. The checks were written from a ministerial task by Barbara Faith and authorized by David Chapman. David Chapman also testified that he had authority over the people in the field. Rick Sobrell said he was a supervisor of the people over the field as well, but that also responsibility was with David Chapman, with plenary authority over the company. With respect to the government saying there's cases just on point, they cite to the Barnett case. Even though Judge Letts, in his opinion, indicated that Barnett breaks from his position, he did not indicate in Barnett is in addition to being a vice president in charge of hiring and firing and supervising at a satellite location, the name of the company in that case was the Anderson Barnett Drilling Company. He later succeeded Anderson as president of the company. He did he bid on jobs. He negotiated contracts. He reviewed bills. He made recommendations to Anderson which creditors should be paid. He testified that he was a business guy. He just didn't have the time to devote to the business. That is the reason in Barnett that they found that he was a responsible person or at least a responsible person as a matter of law. I cite to you the case of Discosio. I understand it's outside of this jurisdiction and it's only what I'll call persuasive authority. The reason is this case could not be more on all fours. A 49% shareholder who had check signing authority was a plumbing foreman in the field responsible for the people in the field. The court held that his act of signing many checks was ministerial in nature and he looked to the direction of the president of the company to make all financial decisions of the company exactly the way Judge Letts did in the district court's opinion regarding Mr. Sobrell. Mr. Sobrell was subordinate in the express authority given to him under the bylaws of the corporation. He was a subordinate in the way the corporation actually worked. All of that seems to be true if you reject what his co-owner said about his authority and knowledge and accept everything he says about his authority and knowledge. Correct? Correct. And I think the district court made a correct finding that they discounted Mr. Chapman's testimony. The district court said, you know, I'm a trier of black and I decide Chapman's wrong and Sobrell is right. Correct? The district court comes to. Yeah, correct. The district court, I think, I don't know if they made it that black and white, but basically they said that Mr. Chapman had a bias in the sense that he wanted to expand the authority that Mr. Sobrell had in an effort to save money for himself. And, of course, Sobrell has every incentive in the world to contract the authority he has in order to save money for himself. Absolutely. But the judge sitting there watching the testimony found Mr. Sobrell very credible. So we've got an evidentiary horse race and the judge accepts Sobrell's statements, right? Except we have a little bit more. We have an outside accountant who testified that not only is he the outside accountant for the company, he's the outside CTA for Mr. Sobrell. What did the outside accountant testify? That Mr. Sobrell didn't understand finances. He never talked to him about the tax problems with the government because it wasn't his world. He only dealt with Mr. Chapman. He was very clear on that point. Mr. Kincaid, an outside satellite office foreman as well, actually a vice president of the company, testified on a direct question from the government with respect to the people in the field. Mr. Kincaid, do you ask Mr. Sobrell as to how many people are going to be there and how to move the people from place to place? Mr. Kincaid testified, no, I do that. All of his contact was with Mr. Chapman. He didn't even go through Mr. Sobrell. Mr. Sobrell controlled the people in the field, and that was to this extent. I'd like to move to the issue of willfulness a little bit. We went through it, and I think there are three independent factors that suggest that June is the operative date for when knowledge occurred, and those three independent facts were specifically testified by Mr. Sobrell. They are that Mitch Price came to him, said, I haven't been paid for about a year. Well, his invoice was in July of 1994. That indicated June. The testimony of Mr. Sobrell and the testimony of Barbara Fay both indicated that in June they had a specific conversation regarding $500,000 owed to the IRS. And the third, June of 95 is when. And the third thing is what we talked about earlier is the last check that Mr. Sobrell received from Chapman Mechanical regarding a payback was June 16th, 1995. And he says, I knew in June of 95 that the government was owed $500,000 of unpaid trust fund tax, right? Correct. And in July, when I'm writing all these big checks to other people, he says, but I thought the government had been paid by then. Is that right? No. The conversation. I didn't care or I wasn't lying. The conversation with that point is he went to Mr. Chapman, and Mr. Chapman indicated. Not to worry. Not to worry. We've got a business loan in place. So when we get into the cognitive thought, the willfulness, or at least reckless disregard of the circuit, did he have, was he preferring other creditors? No. In his mind, he's doing exactly what Mr. Chapman indicated he should do. He's outside that mix. He's not part of the discussions. He never met with the IRS. He knows the IRS is owed $500,000 in June. In July, he's writing big checks to other people. But his story would be, well, I thought the government had been taken care of. Correct. Right? His story is not that he thought they were taken care of. He thought they would be in the future taken care of. And that raises the question with regard both to the knowledge issue and also with regard to the responsible person question. Again, whether he could have said, wait a minute, I'm not signing these checks to other people because we have to pay the government. Well, Your Honor, you're absolutely right. I mean, I submit, based upon everything else, that he wasn't a responsible person. But the checks were handed to him and said, please sign here. He did sign here. And maybe in retrospect, obviously, he should not have done that and just said, I'm leaving the company. But he was told by his what he considered the person completely in charge and the person he took direction for, especially on all financial matters, that don't worry, everything is okay. I've met with the government. We're going to get a loan. We've got receivables coming in, which were not outside of his knowledge base. And so he signed as indicated. So he doesn't ask, well, have you paid the government his $500,000? Or maybe he doesn't even know it's important to pay the government first. Well, no. I think the fair reading of the facts is he did know it was important to pay the government $500,000. So when he's writing these big checks to other people, that's what we have to accept. I tell you, this is what the district judge accepts. When he's writing all these big checks to other people, he's saying, oh, well, the government must have been taken care of. Or else I wouldn't sign these big checks to other people. Well, I think he thinks there's something in the works to take care of that, going down the line. Well, the government will be taken care of someday. It doesn't get him off the hook, does it? Well, the issue is, did he sign the checks with a cognitive thought of preferring other creditors than not? Of course he did. He signed the checks to the trust funds when he knew, if you're saying, which is what I'm going to take as a fact, if he knew the government wasn't paying and he's signing these big checks to other people, that's enough cognition. Well, I still think you have to get into his head. And I would also bring up at this point, there is a reasonable cause exception, at least that was accepted in the Tenth Circuit in Finley. I would ask that the Court consider this. I know they've addressed it in the past and have chosen not to utilize the reasonable cause exception. This is a perfect case that calls for a reasonable cause exception. Let me ask you, we're at the end of your time. I don't want to use it all up. But let me ask you very quickly, the discussion we've had here today makes me wonder more than I did before of how can there be an EAJA fee award under a case like this where there's so much fact that has to be decided on the basis of credibility? There's so many difficult problems. How can there be an EAJA fee award against government? Well, I would submit that the judge made specific findings of fact. He was there to hear the testimony. He believes, Judge Letts believes in his discretion that the government was not substantially justified in their position. The government obviously went and asked Chapman Jr. Let's presume when they were putting the case together, they got one story from Chapman Jr. and another story from Sibrell. If the judge had chosen to believe Chapman Jr.'s, both of whom had reasons to favor their own version, and if the judge had, as you said, in his, as the fact finder found, decided to believe Chapman, then the government would have won. Perhaps in the government's position not to be at least substantially justified when you have a witness who was, if believed, would support them. Support them. Yes, Your Honor, I believe so. But I think what Judge Letts believed was that the government failed to ever analyze the Jones factors. They ticked them off like lottery numbers. And because of the ---- But is it not so that it's on any set of factors, Jones or otherwise, that if Chapman Jr. had been believed, then the government would have prevailed? I don't believe that's the case, because Chapman Jr.'s testimony was not dramatically different from Rick Sibrell's. He tested in generalities. He never gave any specifics of any specific authority that he ever gave Rick Sibrell. He testified in very general nature. And I don't think the testimony or the discovery that was done with Mr. Chapman was anything different before trial. I think that Judge Letts' problem with the government's case from the very beginning until what we see here today is the government still looks at generalities, they tick them off like lottery numbers, they never get in to analyze the factors. Because once you do, and you hear the testimony of ---- and I see I only have a few seconds left, if I could just finish this thought. If you look at all of the testimony, if you look at the express authority, the implied authority, he never was a responsible person, and everything was in agreement with that, the testimony, the documents, and everything that the district court heard. With that, my time is up. Thank you. I indicated I could have a few minutes for rebuttal. I'd just like to point out that this Court has already held that it doesn't matter that Chapman's authority was greater. At most, all of the things that the district court pointed to established that perhaps the Chapman had greater authority than Sibrell. But what matters is whether Sibrell had ---- Mr. Sibrell had enough authority to have written the checks to the government in this case. He wrote checks to himself. That translates at least, you know, the government being substantially justified in concluding that he had the authority to have written checks to the government. Mr. Barnett also pointed out several other points that the district court relied on that this Court had already held in the first case or in the first appeal were not determinative. Mr. Sibrell's lack of knowledge about the taxes at the time they came due and his functional responsibility in overseeing plumbing operations. And this Court has already held in the first appeal that those are not the correct legal standard. What matters is that Mr. Sibrell had the authority to write checks. There's ample testimony. There's testimony in the record. There's a ---- he had signatory authority, and there are all these checks he wrote establishing that he had the authority. And on those facts, I think this is consistent with other cases that have held persons responsible. For example, in the Thomas case, subordinate officers with even significant less authority who weren't even owners. There was an assistant vice president and controller with only a thousand-dollar check-writing authority was held to be a responsible person. And in the George, you know, the Barnett case, it is very similar, but there's also the George case in the Eleventh Circuit where a vice president and 50 percent owner was held responsible as a matter of law. And I think that this case falls in the same territory. Let me ask you this. The ---- after the case went back to the district court and the district court prepared its, you know, findings and conclusions, it took out after the government because the government, according to the district court, mischaracterized the law and the facts, both to the district court and to the court of appeal. What about that situation? I think the district court clearly disagreed with the government and with the court of appeals in the last panel on the correct law and how it applies to this case. But I think the government has accurately represented the law, and I think that this case is very much like other cases, such as the Barnett case and Thomas case, that held officers with similar authority or less authority responsible. And I think the court also seems to strongly disagree and criticize those cases. And I think on the court, the government has accurately represented both the facts unlawful to this court and the court of appeals. The only, you know, the only issue that might possibly arise is that the bylaws ---- we did not have the bylaws in hand before the prior appeal, and I think neither party gave them much attention because the government certainly thought that the bylaws were unlawful. And so I think the court would have to establish Mr. Zabrell's responsibility regardless of what the bylaws said, and apparently the bylaws were, which we couldn't find and we'd ask for on a motion to the court and not gotten were located in Judge Lutz's chambers and all that. Well, in Barnett, the responsible person did confer with the president of the company about major business decisions and all that. Well, there was testimony here that Chapman and Zabrell conferred with one another regarding major decisions and that Mr. Zabrell was in the office in the morning and in the afternoon each day and that they did talk about the business. And Chapman's testimony was that they operated as equal partners. And he did ---- Mr. Zabrell did sign bank loan documents, loan money to the company when it was needed. He did play a role in the corporation's finances. And, you know, in contrast with Barnett, he did actually supervise the payroll. The testimony is that it was Mr. Zabrell who looked at the checks and looked at the ---- not only looked at the time cards, but looked over the checks and made sure that the payroll was correct. And I don't believe ---- Mr. Blank indicated that the testimony was that Mr. Chapman supervised that, but I don't recall any testimony to that effect. I believe the testimony was that Mr. Zabrell was fully in charge of supervising that. And there are cases that point to supervising payroll as being a factor of establishing responsibility. I'd just like to briefly distinguish the Discaggio case. That case involved a minority shareholder in a situation where he couldn't write a great check without being ---- without having another signature or the President's signature on the check as well. So he didn't have independent check writing authority like Zabrell. And he didn't have access to the books, the records, the checkbook like Zabrell did. They were kept under lock and key. And I think that case is readily distinguishable from this case. Yeah, but what about the Court's findings? The Court's findings? I'm sorry. I'm not following what you're referring to. The judge made findings. To the extent the judge found that he didn't have significant authority over corporate finances, he put that finding solely on the bylaws and not the reality of how the corporation was operated. And I think that that's erroneous. It's clearly an erroneous fact-finding. And it's wrong as a matter of law because it disregards California law that indicates that when a ---- and it's cited in our ---- there are several cases cited in our brief that under California law, when a corporate officer exercises a certain authority over a course of time and that authority is acquiesced in by superior officers, that he has that corporate authority. And I think that as a matter of law, Mr. Sobrell, on the facts here, had the authority to be necessary to be a responsible person. All right. Thank you. Thank you, Your Honor. The matter will stand submitted. And we'll pick up next Harris v. Verizon Communications. Thank you. May it please the Court. Good morning. My name is William W. Palmer. I represent the plaintiffs' appellants, Gene Harris, Peggy Dominguez, Annette Schoon, Russ Garcia, and Julie Jackson. I'd like to thank the Court for their time. I would specifically wish to reserve five minutes to respond or rebut opposing counsel's comments. This case challenges the actions of two corporations, GTE and its successor, Verizon, which failed to follow state and federal laws regulating securities with respect to 8,500 of their minority shareholders. Their failure to observe these basic state and federal laws resulted in the unauthorized transfer of the shareholder's stock to the government, specifically to a third party, the Comptroller for the State of California, without notice and allegedly pursuant to the unclaimed property law. The state then sold the stock, once again without notice, in violation of the Fourteenth and Fifth Amendments. GTE did not have the permission of the minority shareholders when the corporations transferred the shareholder's stock pursuant to these laws. Under existing law, unless GTE and Verizon can establish that the corporations provided notice to the injured shareholders and that the stock transfers were authorized, under fundamental securities laws and the unclaimed property law itself, then the corporations are obliged to reverse the issue and return the stock to the injured shareholders. If I understand it, your position wanted to be, or maybe is, that you're not concerned about ESOPs or ERISA plans or anything else. You just brought an action saying, you guys, corporations, not plan, you guys mishandled our stock and we're suing you for the evil you wrought by doing that mishandling. So you brought an action, let's say the well-pleaded complaint, was simply a state of the art actions, not a security action, that you brought, or a security action at the time you brought it, or tort actions, that kind of thing. If that's true, the case really was not removable. Is that right? Yes, Your Honor, and I'd like to cite to the record on an important point, which also I would like to direct Justice Fair's own to. She wrote, or was on the panel with Justices Nelson and Beazer in the issue case. It's Judge, by the way, not Justice. The plaintiffs, and I didn't represent them at this time, they didn't run to the court and immediately file a complaint. They first went to the corporation. They asked what happened with their stock, and this is set out in paragraph 8. I actually am a little mystified about why this is, at least in whole, considered to be an ERISA plan. You seem to be agreeing, however, that at least the source of these stocks to begin with, and I'm not sure that's entirely relevant or dispositive, the ESOP plan is an ERISA plan. May I, Justice Berzon? Judge Berzon. We call ourselves judges. There's no justice in the 9th Circuit. Thank you. I'd like to respond first to Justice, or Judge Preggerson first, his comments. We do not believe this case was ever removable, and I'd like to explain why, and I'd like to point to you to the complaint, paragraph 13. The plaintiffs, through their counsel, contacted Verizon. Verizon then told them that Verizon had no record of these people and repudiated them. They didn't have any obligation to them. So under Caterpillar, you would say, if I take it, under Caterpillar, if they want to claim that it really is an ESOP and that's what it's really about, they ought to raise that defense as a defense in state court, but that doesn't make it removable, correct? That's true, but I'd also like to point out another key point here. You're absolutely correct on that point. Had these fiduciaries wished to assert their ERISA plan, they should have provided the people with the ERISA plan at the time they first contacted them, instead of denying that they had any obligation to look out for them whatsoever. They repudiated all their obligations. But we're talking about different fiduciaries, are we not? There's a fiduciary of an ERISA plan. I thought you were charging these people with being fiduciaries in the sense that corporate officers have fiduciary quasi, fiduciary duties to shareholders. Is that correct? That is the thrust of the complaint, yes. That is the relationship we're talking about. Minority shareholders to a corporation. We're not talking about employees to the ERISA plan. Let's assume that what we just said was true, that it should not have been removed in the first place, so the district court was without jurisdiction. Do we have any problem when you then decided you would also spin out a Federal securities action? I was not the... Not by a problem, I mean. Does the case remain in the district court anyway? Well, for purposes of removal, you judge the jurisdiction based on the initial complaint. There was no Federal claim at that time. I think what... Yeah, but you know there's some funny Supreme Court stuff that after a case, I believe that a case that even pushes that further, that after the case has gone to trial, even if there wasn't really diversity in the first place, well, we're not going to look back and try to undo it all. We're just going to say, oh, well, there's diversity now. So to put it another way, one said, well, there was no jurisdiction in the first place, but now that you've amended your thing, there's Federal question jurisdiction, so we should just forget that. Leave the case in Federal court in some kind of posture. I couldn't hear what you said, Justice Preggerson. I'm sorry. I thought you were Fernandez. I'm sorry. Go ahead. Thank you. You're welcome. And thank you. You're welcome. Okay. Well, you're off to a good start. There we go. Okay. The question is, does the fact you've now spelled out a Federal cause of action, securities cause of action, cure the initial problems sort of like the Supreme Court has sometimes cured it? I would take the reverse and say that it was never proper to remove this complaint in the first place and that it couldn't be cured later. Okay. The case was pled as a State law complaint. As I said, the Plaintiffs' Council approached Verizon. They repudiated their obligations and then later on appeared with the notice to remove and attach the ERISA plan and then removed it. They didn't say you've got an ERISA option. I keep asking and I'm still a little mystified about why there's an ERISA plan. As I understand the plan, the money is transferred. It's non-contingent stock that is allocated to the individual immediately, not contingent on retirement, not contingent on disability, not contingent on severance. And it is in their name with a trustee, but they can vote the stock. They have some kind of an ownership interest in it at the outset. Right? Moreover, as I understand it, if they ask for seven years, if they ask for distribution, they can get it. Is that right? No. That's not right? No, and I'll explain why. These people haven't been employees at that corporation since the late 1990s. I'm talking about the plan. I'm not looking at the plan. I want to know why it's an ERISA plan. Why don't I read you the terms of the plan at page 429? Yes. It's in the – It's in your interest to be an ERISA plan, and I'm not exactly sure why it is one, at least in large part. The shares were issued to the people without their knowledge and then transferred to the State where they were sold. The plan or whatever it was, the ESOP, said, and this is – I'm reading directly from the Court's order at page 429. The shares are held in trust for seven years and will be distributed then or upon termination of employment. Okay. So why is it an ERISA plan? An ERISA plan is not all employee benefits. It's only employee benefits which are for purposes of retirement, disability, severance, and some other things. But here you can get your hands on the money if you want to. Well, we didn't believe ERISA ever applied to this complaint in the first place. That's why you pledged it in the State law. You never seem to have argued that it wasn't an ERISA plan. We didn't get tangled up in the ERISA plan. We simply pledged this in State court. I understand, but after they removed it. All right. What is your argument now about why it was not properly removed exactly? This is a corporation-shareholder relationship. The class is composed of employees and non-employees, former and current employees. It's not – it doesn't fall within the terms of – You're saying you're only dealing with the stock after they got it in whatever form they got it. Right. They've held the stock supposedly, although they never received any communications, for 20 or 30 years. They only found out that the stock was at the controller's office by happenstance. And that's what you pled. Yes. That was your case. You've got a lot of other junk in there that can confuse things, but that's what you pled, right? So we're right back to the thing. Even if it is an ERISA, ESOP, that would be a defensive matter, would be your position, right? They can file an answer in the defense. Correct. I personally don't think ERISA or ESOP applies to this in the extent that it ever did apply. They waived it when they repudiated their obligations to these people. Well, I don't know that an ERISA trustee can repudiate his obligations and get out from under ERISA. That would be a little bit simple. Okay. If there's no further questions, I'd like to reserve my remaining nine minutes.
judges: Pregerson, Fernandez, Berzon